UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GAYLE WORMALD, | ) | CASE NO.:   5:21-cv-00585 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | JUDGE JOHN R. ADAMS |
| OVERHEAD DOOR CORPORATION, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | |

Pending before this Court is Defendant Overhead Door Corporation's ("Overhead Door") motion for summary judgment. (Def.'s Mot. for Summ. J., ECF No. 26. *See also* Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 34; Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 41.) The question before this Court is whether a reasonable juror could find that Overhead Door took an adverse employment action against Plaintiff Gayle Wormald ("Wormald") because she took leave under the Family Medial Leave Act ("FMLA"). For the following reasons, this Court finds that no reasonable juror could find Overhead Door retaliated against Wormald for taking FMLA leave. Accordingly, Overhead Door's motion for summary judgment is GRANTED.

I. **RELEVANT FACTUAL BACKGROUND**

The following relevant facts are undisputed. In March 2018, Overhead Door hired Wormald as part of the Human Resources Department at the Mount Hope, Ohio plant. (Wormald Dep. 23:12-13, ECF No. 23. *See also* Wormald Dep. Exs. at 5-6, ECF No. 23-1.) Wormald's responsibilities were "plant-wide recruiting and retention" along with assisting "the HR Manager in the human resources functions." (Wormald Dep. Exs. at 5, ECF No. 23-1. *See also* Wormald Dep. 24:4-7, 27:17-28:4, ECF No. 23.) Anne Wallick ("Wallick") was Wormald's supervisor. (Wormald Dep. 30:12-14, ECF No. 23; Wormald Dep. Exs. at 5-7, ECF No. 23-1.) At the end of 2018, Wallick

rated Wormald's overall performance as exceeded expectations and commented positively about Wormald's recruiting performance specifically. (Wormald Dep. Exs. at 7, ECF No. 23-1.)

In March 2019, Wormald transferred to Overhead Door's Dalton, Ohio plant as HR Manager. (Wormald Dep. 35:20-21, ECF No. 23; Wormald Dep. Exs. at 26-27, ECF No. 23-1.) Thomas Waite ("Waite") was Wormald's supervisor. (Wormald Dep. Exs. at 27, ECF No. 23-1.) James Dolan ("Dolan") was the Dalton, Ohio Plant Manager at the time Wormald transferred to the Dalton, Ohio plant. (Wormald Dep. 42:17-21, ECF No. 23.)

In the summer of 2019, Wormald needed to take intermittent FMLA leave to care for her husband. Overhead Door contracted with a third-party for the administration of all employee requests for FMLA leave. (*Id.* at 43:16-21, 46:18-20. *See also* Wormald Dep. Exs. at 107, ECF No. 23-1.) Between August 19, 2019 and November 8, 2019, Wormald requested, and Overhead Door's third-party administrator approved, thirteen days of intermittent FMLA leave to care for her spouse. (Wormald Dep. Exs. at 117, ECF No. 23-1.) During this period, Wormald had performance issues.

In August and September 2019, Wormald failed to submit temporary labor hours as necessary, and instead submitted them in October 2019 resulting in inaccurate financial records for the plant. (*Id.* at 137-38.) Dolan reported this error to Waite. (*Id.*) Despite Dolan requesting Waite give Wormald a verbal warning, Wormald was not counseled on this error. (Wormald Dep. 67:19-68:11, ECF No. 23.) In October 2019, Dolan received information that a temporary employee was coordinating employees and a location for a safety training on Wormald's behalf. (Wormald Dep. Exs. at 139-142, ECF No. 23-1.) Dolan admonished Wormald that the temporary employee was not Wormald's administrator and that Wormald was personally responsible for communicating HR and safety related issues. (*Id.*)

On occasion, Overhead Door employees would work at a different location than usual. (Wormald Dep. 72:25-73:2, ECF No. 23.) When this happened, the employees' hours had to be accounted for at the proper location – the location at which they actually worked. (*Id.* at 73:3-5.) On November 5, 2019, Dolan emailed Waite alleging Wormald manually entered these hours incorrectly. (Wormald Dep. Exs. at 143-145, ECF No. 23-1.) In this email, Dolan claimed eight Overhead Door employees did not wish to work with Wormald "due to 'incompetence.'" (*Id.* at 143.)

That same day, Wormald also emailed Waite about issues she had experienced with Dolan as well as the plant controller, Greg Hayden ("Hayden"). (Wormald Dep. Exs. at 158-59, ECF No. 23-1. *See also* Wormald Dep. 65:17-20, ECF No. 23.) Wormald's email reiterated Dolan's frustrations regarding the submission of temporary labor hours, the submission of hours when an employee works at a different location, and Wormald's delegation of duties to the temporary employee. (Wormald Dep. Exs. at 158, ECF No. 23-1.) Wormald also alleged that she heard a comment from Hayden to Dolan regarding her FMLA leave and believed Hayden and Dolan acted differently towards after the comment was made. (*Id.*) Wormald did not say what the comment was in the email correspondence to Waite. (*Id.*)

On November 6, 2019, Wormald emailed Dolan asking if she could remove handicapped parking spots from the parking lot. (*Id.* at 148.) Dolan responded that Wormald should take care of the issue "within legal guidelines" and asked not to be notified regarding the issue further. (*Id.*) Wormald emailed back minutes later asking "you are ok with me doing it within the guidelines?" (*Id.*) Dolan, apparently irritated with Wormald about her follow up question, sent this email correspondence to Waite. (*Id.*) Wormald separately sent the email correspondence to Waite. (*Id.* at 160.) Waite indicated he would speak in person with Dolan and Wormald about the issue. (*Id.*)

On November 11, 2019, an Overhead Door employee reported to Dolan that two employees were not paid, not all of their hours were accounted for because of an HR mistake, some employees were not trained by HR on the operating system, and one employee was never entered into the operating system. (*Id.* at 146.) Dolan escalated this report to Waite on November 12, 2019. (*Id.*) Contemporaneous with this complaint regarding Wormald's performance, Wormald requested, and Overhead Door's third-party administrator approved, four continuous days of FMLA leave from November 12, 2019 through November 15, 2019 for Wormald's own serious health condition. (*Id.* at 117.)

Between November 23, 2019 and February 5, 2020, Wormald requested, and Overhead Door's third-party administrator approved, seventeen days of intermittent FMLA leave to care for her spouse. (*Id.* at 117-118.) During this time period, the tension between Dolan and Wormald continued. On December 19, 2019, Wormald emailed Dolan requesting he complete a training no later than the next day. (*Id.* at 151.) Apparently irritated Wormald set a deadline for him and far before the company deadline of January 1, 2020, Dolan told Wormald she was "out of line" and instructed Wormald to forward the email communication to Waite. (*Id.* at 150-152.) Wormald did so. (*Id.* at 153.)

The next day, December 20, 2019, Dolan emailed Wormald asking when she would have time to sort through and discard training materials that were stored in a conference room. (*Id.* at 154.) In response, Wormald asked if someone from maintenance could bring the materials to her office until she had time to sort and discard. (*Id.*) Dolan escalated this email chain to Waite, complained that Wormald disregarded his request and asked a question, and complained: "Not sure how someone so incompetent provides our HR representation." (*Id.*)

On January 29, 2020, Wormald sent a lengthy email to Waite detailing her issues with Dolan. (*Id.* at 169.) This email generally claimed Hayden made "derogatory remarks" about her FMLA leave and Dolan "made negative comments as well." (*Id.*) Wormald's email reiterated the issues between her and Dolan regarding the submission of temporary labor hours, the submission of hours when an employee works at a different location, and Wormald's delegation of duties to the temporary employee. (*Id.*) Wormald repeated her belief that Hayden and Dolan were treating her poorly because of her FMLA leave. (*Id.*) Wormald claimed in the email that Dolan stated, on November 11, 2019, that he "hates FMLA" and that a prior employer of his purposefully employed fewer than fifty people to avoid awarding employees FMLA leave. (*Id.* at 170.) In response to this email, Vice President of Human Resources, Jodie Hayes, asked Regional Director of Human Resources, Don Duncan, to visit "the Dalton, Ohio plant and investigate complaints several employees had made about [] Dolan." (Duncan Aff. ¶ 5, ECF No. 26-3.) There is no evidence in the record suggesting that the other employees who complained about Dolan's behavior had ever taken FMLA leave.

Duncan spent approximately one month at the Dalton, Ohio plant investigating – the investigation included interviewing Wormald, Dolan, and Waite. (*Id.* at ¶ 6. *See also* Wormald Dep. 112:12-21, 114:14-16, ECF No. 23.) According to Duncan, Waite "was not satisfied with Wormald's performance and her judgment as a plant human resource manager." (*Id.*) Along with conclusions about Dolan and his management style, Duncan concluded through his investigation "that Wormald would fail if she stayed on as plant human resources manager based on" her performance issues. (*Id.* at ¶ 11. *See also* Wormald Dep. Exs. at 183-84, ECF No. 23-1.) Ultimately, at the end of February 2020, Wormald transferred back to the Mount Hope, Ohio plant and assumed the role of Senior Recruiter without a change in base pay and Wallick was her

supervisor once again. (Wormald Dep. Exs. at 185-86, ECF No. 23-1.) As Senior Recruiter, Wormald was no longer eligible for a bonus. (*Id.*) However, Overhead Door was working on implementing a bonus program for Wormald that matched her bonus program when she was HR Manager at the Dalton, Ohio plant. (*Id.* at 191-92, 195.)

On March 20, 2020, Overhead Door froze recruiting company-wide given the uncertainty surrounding the Covid-19 pandemic. (*Id.* at 198-99.) During this freeze Wormald requested, and Overhead Door's third-party administrator approved, fourteen continuous days of FMLA leave from March 24, 2020 through April 10, 2020 for Wormald's own serious health condition. (*Id.* at 118-119.) Given the ongoing business uncertainty due to the Covid-19 pandemic, effective April 13, 2020, Wormald, along with other Overhead Door employees, was furloughed. (*Id.* at 206-14.) The furlough was expected to last through June 26, 2020. (*Id.*) Instead, the furlough was extended through July 31, 2020, and Wormald was terminated from Overhead Door effective August 1, 2020. (*Id.* at 217.) When informed about her termination, Wormald asked Wallick about an open HR Business Partner position with Overhead Door. (Wormald Dep. 148:2-14, ECF No. 23.) Wallick told Wormald it would not be a good fit. (*Id.* at 149:9-11.) On March 12, 2021, Wormald filed this matter against Overhead Door alleging retaliation in violation of the FMLA. (Compl., ECF No. 1.)

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) sets forth that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). This Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

Once the movant's burden is met, the burden shifts to the non-moving party to "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992). In so doing, the non-moving party must present evidence supporting its claims. *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001) ("The party opposing the motion may not rely solely on the pleadings and must adduce more than a mere scintilla of evidence"). Of note, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)) (internal quotation marks omitted) (*emphasis* in original).

Material facts are those "that might affect the outcome of the suit under the governing law," while other irrelevant or unnecessary factual disputes do not affect the summary judgment analysis. *Anderson*, 477 U.S. at 248. Additionally, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). When making these determinations, this Court cannot engage in any "'jury functions' such as making

credibility determinations and weighing the evidence." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson*, 477 U.S. at 255). However, any "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587-88 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (internal quotation marks omitted). Accordingly, "the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243 (syllabus).

### B. FMLA Retaliation

The Family Medical Leave Act ("FMLA") entitles employees up to twelve work weeks of leave per year for specific circumstances, including either caring for an immediate family member who has a serious health condition or because the employee herself has a serious health condition. 29 U.S.C. § 2612. By its nature, the FMLA "affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA." *Marshall v. Rawlings Co.*, 854 F.3d 368, 376 (6th Cir. 2017) (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003)) (internal quotation marks omitted). Employers are prohibited from using "the taking of FMLA leave as a negative factor in employment actions." *Marshall*, 854 F.3d at 376 (quoting *Arban*, 345 F.3d at 403). Employers are prohibited from demoting or terminating an employee because an employee took FMLA leave. *See Arban*, 345 F.3d at 403; *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005). "[R]etaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (*emphasis* in original).

In matters, such as this, where a plaintiff provides circumstantial evidence of retaliation in violation of the FMLA, the burden-shifting framework set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973), is applied. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 528 (6th Cir. 2020) (citing cases).

1. *Prima Facie Case of FMLA Retaliation*

First, under *McDonnell Douglas*, the plaintiff must set forth a prima facie case of FMLA retaliation. *See McDonnell Douglas*, 411 U.S. at 802. "To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) [s]he engaged in an activity protected by the Act, (2) this exercise of [her] protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial v. UPS*, 840 F.3d 292, 308 (6th Cir. 2016) (citing *Arban*, 345 F.3d at 401). The parties only dispute the fourth element. There is no question Wormald took FMLA leave, that Overhead Door knew Wormald took FMLA leave, and that Wormald experienced an adverse employment action when she was terminated. This Court will also consider Wormald's transfer to the Senior Recruiter position as an adverse employment action. Although Wormald's base pay was not affected and the transfer appears to have been lateral, her HR job responsibilities were taken away and she believed she was no longer bonus eligible as she was when she was in management. *See Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 628 (6th Cir. 2013) ("a lateral transfer is actionable as an adverse employment action if the conditions of the transfer would have been objectively intolerable to a reasonable person") (citing *Fisher v. Wellington Exempted Village Schs. Bd. of Educ.*, 223 F. Supp. 2d 833, 843 (N.D. Ohio 2001)).

Therefore, the first question before this Court is whether Wormald has met her burden of demonstrating a causal connection between her taking FMLA leave and her position transfer as well as a causal connection between her taking FMLA leave and her termination. "The burden of

proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 284 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)) (internal quotation marks omitted). "In order to establish such a causal connection, a plaintiff must show some type of retaliatory intent." *Tennial*, 840 F.3d at 308.

Often, "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Seeger*, 681 F.3d at 283-84 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)) (internal quotation marks omitted). *See also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."). Temporal proximity of two or three months between the plaintiff's protected activity and the adverse employment action is "sufficient evidence of a causal connection." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014) (citing *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011)).

Because the threshold for demonstrating a prima facie case of FMLA retaliation is so low, this Court finds that Wormald has met her burden. She began taking intermittent FMLA leave in August 2019 and was not terminated until one year later – a length of time by which this Court cannot infer causal connection between Wormald's FMLA leave and the adverse employment action. However, Wormald finished a period of intermittent FMLA leave in early February 2020 and was transferred to the Senior Recruiter position in late February 2020. Additionally, Wormald

finished a period of continuous FMLA leave in April 2020 and was almost immediately furloughed and ultimately terminated. This is enough for this Court to infer, for Wormald's benefit, a causal connection at this stage in analysis.

> 2. *Legitimate, Nondiscriminatory Reasons for Adverse Employment Action*

Because Wormald has set forth a prima facie case of FMLA retaliation, the burden shifts to Overhead Door "to proffer some legitimate, nonretaliatory reasons" for any demonstrated adverse employment action. *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). An adverse employment action is legitimate and nonretaliatory if it "would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban*, 345 F.3d at 401. The question, really, is whether Overhead Door provided an appropriate explanation of its decisions as this Court will not operating as a "super-personnel department" and "substitute its judgment for that of management." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)) (internal quotation marks omitted).

Overhead Door has demonstrated Wormald's performance as HR Manager was poor. Wormald failed to properly submit temporary labor hours resulting in inaccurate financial records. Wormald failed to properly enter employee hours at the location they worked for proper accounting. Wormald asked a temporary employee to complete her work. Wormald's mistakes resulted in missing paychecks for employees, inaccurate accounting of employee labor hours, and missed trainings for employees. Despite Wormald's attempts to spread the blame for these mistakes to other employees, she is careful to never deny the fact that each of these instances occurred. (Wormald Dep. 62:21-63:13, 64:7-17, 64:24-65:3, 69:3-14, 72:17-5, 74:11-17, 75:10-76:7, ECF

No. 23.) Poor performance is a legitimate, nonretaliatory reason for Wormald's adverse employment actions – both the transfer to the Senior Recruiter position and her termination.

In addition, business concerns over the Covid-19 pandemic and associated reductions in workforce are also legitimate, nonretaliatory reasons for Wormald's ultimate termination – especially given the reduction in workforce would have occurred regardless of Wormald's taking FMLA leave because of ongoing uncertainty with a global pandemic.

Wormald argues, however, that any adverse employment action she experienced was not legitimate or nondiscriminatory and would not have occurred had she not taken FMLA leave. Wormald contends that Dolan's bias infected Overhead Door's decision to both transfer her to the Senior Recruiter position and terminate her. Wormald employs the cat's-paw theory for this argument.

"[T]he term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall*, 854 F.3d at 377 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)) (internal quotation marks omitted). Under this theory, Wormald seeks to hold Overhead Door "liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Marshall*, 854 F.3d at 377 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)).

Occasionally, "a company's organizational chart does not always accurately reflect its decisionmaking process." *Marshall*, 854 F.3d at 378 (quoting *BCI Coca-Cola*, 450 F.3d at 486). Meaning, a lower-level employee may have the opportunity to significantly sway a final decision maker with respect to adverse employment actions – especially when the final decision maker is

not involved in day-to-day operations as significantly as the lower-level employee is. *Marshall*, 854 F.3d at 378. In other words, "[a] biased low-level supervisor with no disciplinary authority might effectuate the termination of an employee from a protected class by recommending discharge or by selectively reporting or even fabricating information in communications with the formal decisionmaker." *Id.* (quoting *BCI Coca-Cola*, 450 F.3d at 486).

In sum, under the cat's paw theory, "the allegation is that a biased subordinate intentionally manipulated the decisionmaker." *Marshall*, 854 F.3d at 380. However, "evidence of a biased recommendation" is not always enough to satisfy this theory. *Id.* "A supervisor who conducts an in-depth and truly independent investigation is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation." *Id.* In other words "an independent investigation defeats a cat's paw claim only when the investigation 'determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Id.* (quoting *Staub*, 562 U.S. at 421).

Wormald's cat's paw theory argument fails. It is clear that Wormald and Dolan did not get along. In fact, it is clear that Dolan did not get along with many of his coworkers. There, however, is no connection between Dolan's inter-personal difficulties and Wormald's FMLA leave. Even if this Court were to assume that Dolan targeted Wormald because of her FMLA leave, there is no indication Dolan infected Overhead Door's decision making process or manipulated any decisionmakers – Waite, Wormald's direct supervisor; Duncan, who conducted the independent investigation; or Hayes, who made the ultimate decision to transfer Wormald and to terminate Wormald.

With respect to Waite, although Dolan escalated many of his frustrations with Wormald to Waite, none of them mentioned FMLA leave or even Wormald's absences from work in any

respect. Second, Dolan requested Waite give Wormald a verbal warning for one of her performance mistakes – a request Waite did not ultimately grant indicative that Waite did not blindly follow Dolan's suggestions. Finally, Duncan's investigation found that Waite himself had concerns regarding Wormald's performance without reference to or discussions of Wormald's FMLA leave.

With respect to Duncan, he conducted an independent investigation into all complaints against Dolan. Duncan was not involved in the daily operations of the plant. Duncan had not been previously informed of Wormald's performance issues. Dolan had never forwarded email communications to Duncan regarding Wormald's performance as he had with Waite. Duncan interviewed every person who complained about Dolan, including the employees who had never taken FMLA leave – indicative of Dolan's issues with all employees regardless of FMLA status. Duncan performed a one-month, thorough investigation into the issues Overhead Door employees were experiencing with Dolan, and while concluding that Dolan needed to work on his inter-personal skills, he also concluded that Wormald was not succeeding at the HR Manager position. In this Court's view, no reasonable juror could find that Duncan's conclusion was infected by Dolan's alleged contempt for Wormald's FMLA leave. Duncan's independent investigation, setting aside any contempt from Dolan, concluded that Wormald was not succeeding at her job, making Wormald's transfer to the Senior Recruiter position justified. Particularly because Wormald had demonstrated success recruiting for Overhead Door prior to her failings as an HR Manager.

Finally, there is no evidence that Hayes, who ultimately approved of Wormald's transfer to the Senior Recruiter position, was infected by Dolan's alleged animus towards Wormald because of her FMLA leave. Even if Hayes just rubber-stamped Duncan's suggestion to transfer Wormald,

Duncan's determination was uninfected. In other words, any poison remained with Dolan and no reasonable juror could find that the decision to transfer Wormald to Senior Recruiter was biased. Wormald's cat's paw theory with respect to her transfer to Senior Recruiter fails.

With respect to Wormald's termination, there is no evidence whatsoever that Dolan was even remotely involved in the decision. There is no evidence Waite or Duncan were involved either. Overhead Door, like many companies, had to make difficult decisions while faced with uncertainty during a pandemic. To the extent Wormald suggests Wallick was manipulated by Dolan to terminate Wormald rather than hire her for the HR Business Partner position open at the time of Wormald's termination, Wormald does not connect Dolan to Wallick in any meaningful way. In other words, Wormald has not presented any evidence such that a reasonable juror could find Dolan, harboring alleged animus against Wormald for taking FMLA leave, influenced Wallick's hiring decisions.

In sum, Wormald's cat's paw theories fail. No reasonable juror could find that Overhead Door did not provide adequate evidence of a legitimate, nonretaliatory reason for both transferring Wormald to the Senior Recruiter position or terminating her.

    3. *Pretext*

Because Overhead Door provided legitimate, nondiscriminatory reasons for the adverse employment actions against Wormald, the burden shifts back to Wormald to demonstrate that the proffered legitimate, nonretaliatory reasons for any adverse employment action "were not the true reasons" for the adverse employment action, "i.e., that the reasons were a pretext for retaliation." *New Breed Logistics*, 783 F.3d at 1066. "[A] reason cannot . . . be a pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason." *Robinson*, 821 F. App'x at 529-30 (quoting *Seeger*, 681 F.3d at 285) (internal quotation marks omitted).

Wormald can establish pretext by showing the proffered reason: (1) "had no basis in fact"; (2) "did not motivate the termination"; or (3) "was insufficient to warrant the termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [] intentionally discriminated against him." *Robinson*, 821 F. App'x at 530 (quoting *Seeger*, 681 F.3d at 285) (alterations in original).

Under the first method of attack, Wormald attacks the credibility of Overhead Door's reasons for transferring her to Senior Recruiter and terminating her by demonstrating that Overhead Door did not actually have cause to take these adverse actions. *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). Wormald has not demonstrated that Overhead Door's allegations of her poor performance are false. Wormald attempts to cloud this determination by pointing fingers and placing blame on others, but she never denies the underlying mistakes. This is not enough, however. There is also no disputing global uncertainty in markets given the Covid-19 pandemic. Therefore, Wormald has not demonstrated Overhead Door did not have cause to transfer her to Senior Recruiter or terminate her.

Under the second method of attack, Wormald admits the reasons could have motivated Overhead Door, but asserts "that the illegal reason is more likely than the proffered reason to have motived the employer" by providing "evidence sufficient to allow a reasonable juror to find that" Overhead Door was motivated by the illegal reasons. *Joostberns*, 166 F. App'x at 791. Wormald also fails here. Besides alleging that Dolan twice made comments about her FMLA leave, there is no evidence connecting Wormald's FMLA leave to any adverse employment action she experienced.

To the extent Wormald suggests that Overhead Door's failure to hire her for the HR Business Partner position when she was terminated demonstrates that retaliation for taking FMLA leave was Overhead Door's true motivation for terminating Wormald, Wormald fails to demonstrate that she was qualified for the HR Business Partner position. Wormald demonstrated strong recruiting skills with Overhead Door but struggled with HR responsibilities. There is not sufficient evidence to determine that Wormald was qualified for the HR Business Partner position such that Overhead Door's failure to hire Wormald for that position demonstrates they were truly motivated by retaliating against Wormald for taking FMLA leave.

Finally, under the third method of demonstrating pretext, Wormald must admit the "proffered reason has basis in fact but denies that it created sufficient cause for the adverse employment action." *Joostberns*, 166 F. App'x at 791. Wormald does not demonstrate that her poor performance was insufficient to justify her transfer to Senior Recruiter. She does not demonstrate that the pandemic was insufficient to justify her termination. Wormald does not point to any other employee, similarly situated, who was treated differently. In other words, Wormald does not demonstrate that Overhead Door hired back a recruiter who did not take FMLA leave after being furloughed because of the pandemic. Wormald does not point to any other employee who had performance issues and was not transferred, indicative that Wormald was only transferred because of her FMLA leave rather than her performance issues. In other words, Wormald does not provide enough to demonstrate that her FMLA leave motived Overhead Door rather than her poor performance or the pandemic.

Because Wormald fails to demonstrate that Overhead Door's legitimate, nonretaliatory reasons for adverse employment actions – poor performance and a pandemic – were pretextual, no genuine issue of material fact exists regarding whether Wormald's transfer to Senior Recruiter or ultimate

termination were retaliatory. No reasonable juror could find that Overhead Door terminated Wormald because she took FMLA leave.

### III.  CONCLUSION

For all the foregoing reasons, Overhead Door's motion for summary judgment is GRANTED. (Def.'s Mot. for Summ. J., ECF No. 26.) This Court specifically holds that no reasonable juror could find that Overhead Door retaliated against Wormald for taking FMLA leave.

IT IS SO ORDERED.

DATE: October 13, 2022   /s/ John R. Adams
Judge John R. Adams
UNITED STATES DISTRICT COURT